UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                 :

HENRY McCALL,

                                 :     06 Civ. 3365 (SAS) (DF)

                     Petitioner,

                                 :     **REPORT AND**

     -against-                            **RECOMMENDATION**

                                 :

SUPERINTENDENT M. McGUINNESS,

                                 :

                     Respondent.
-------------------------------------------------------X

**TO THE HONORABLE SHIRA A. SCHEINDLIN, U.S.D.J.:**

<u>**INTRODUCTION**</u>

*Pro se* petitioner Henry McCall ("Petitioner"), seeking a writ of habeas corpus under 28 U.S.C. § 2254, challenges his 2002 conviction in the New York State Supreme Court, New York County. Upon a jury verdict, Petitioner was found guilty of two counts of attempted murder in the second degree, one count of assault in the first degree, and one count of attempted assault in the first degree, and was sentenced as a second felony offender to consecutive 10 and 12 year terms of imprisonment. Petitioner is currently incarcerated at the Southport Correctional Facility in Pine City, New York.

In his habeas petition, Petitioner pleads two grounds for relief. First, Petitioner claims that, by consolidating – in a single trial – indictments stemming from two separate shootings, the trial court violated Petitioner's 14th Amendment right to due process. (*See* Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Apr. 13, 2006 ("Pet."), at ¶ 13 and attachment thereto.) Second, Petitioner claims that, in summation, the prosecutor made improper comments that were so egregious that they deprived Petitioner of a fair trial. (*See id.*)

In response to the first claim, Respondent argues that Petitioner's due process rights were not violated by the consolidation of the charges against him, as consolidation was both proper under New York law and not prejudicial.  (Answer [Declaration] of Gary Snitow, dated Oct. 19, 2006 ("Snitow Decl."),[1] Ex. B (Brief for Respondent).)  As to the second claim, Respondent argues that the prosecutor's comments in summation were appropriate, and that, even if some were improper, any error was harmless in light of the trial court's corrective instructions and the strength of the evidence of Petitioner's guilt.  (*See id.*)

For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    The December 10, 2001 Shooting of Michael Leslie

On December 10, 2001, at about 7:15 p.m., Michael Leslie ("Leslie"), who was then 16 years old, walked out of his apartment building in the Jefferson Housing Projects on 112th Street between First and Second Avenues in Manhattan and encountered Petitioner, whom Leslie knew by the name "Junior."  (Transcript of trial proceedings commencing Oct. 30, 2002 ("Tr."), at 102-04.)  Leslie and Petitioner got into an argument and Leslie speculated that it started because Petitioner was "drunk or high."  (*Id*. at 104.)  During the argument, Petitioner reached for and yanked at a gold chain that Leslie was wearing around his neck and then swung at Leslie.  (*Id*. at 104-05.)  Leslie first tried to protect himself, but then fought back, knocking Petitioner down. (*Id*. at 105-08.)

---

[1] While titled an "Answer," this document contains statements made under penalty of perjury pursuant to 28 U.S.C. § 1746, and thus is more aptly considered a "declaration."

Leslie testified that, after the fight, he went upstairs to his apartment to tend to a cut on his finger (*id.* at 108-09),[2] while Petitioner got up and ran into another nearby building in the housing project (*id.* at 108.)  Both Leslie and Petitioner eventually came back downstairs (*id.* at 109), and Leslie saw Petitioner "approaching [him] . . . with his hands in his jeans."  (*Id.*)  Leslie ran because he thought that Petitioner was reaching for a gun.  (*Id.*)

Another resident of the Jefferson Houses, Margarita Gonzalez ("Gonzalez"),[3] looking down from her second floor apartment, saw Petitioner take out a gun and called the police.  (*Id.* at 17, 24.)  According to a 911 tape, Gonzalez told the police that Petitioner (whom she identified as "18 years old . . . [n]ame of Henry McCall, called Junior on the street") was shooting at people.  (*Id.* at 201.)  A third resident, Murray, who had been sitting outside at the time (*see* n.2, *supra*) saw Petitioner fire the gun (*id.* at 135), and Leslie's mother, looking through a window in her seventh floor apartment, saw Petitioner shooting at Leslie while he was running (*id.* at 144).  Leslie was grazed in the neck by a bullet.  (*Id.* at 111.)  The wound was first treated by his mother and then treated in the hospital the next day.  (*Id.*)  Although there were about 20 people in the area when the shooting occurred, Petitioner was the only one seen with a gun.  (*Id.* at 110, 135.)

---

[2] Quansa Murray ("Murray"), a witness who observed the fight, testified that, after the fight, Leslie initially ran over to where he and others were sitting, to "describ[] his victory . . . over Junior."  (*Id.* at 135.)

[3] Gonzalez was also the mother of the second shooting victim, Eliphelety Gonzaga, as discussed below.  (*See* Section B.)

3

**B. The December 12, 2001 Shooting of Elephelety Gonzaga**

Two days after the shooting of Leslie, a second shooting incident occurred at the Jefferson Houses. At that time, Eliphelety Gonzaga ("Gonzaga") was home from Maryland and visiting his mother. (Tr. at 50.) At about 2:00 p.m. on December 12, 2001, Gonzaga left his apartment in the Jefferson Houses, and, as he was walking towards 112th Street and First Avenue, Petitioner and four other individuals approached him. (*Id*. at 53.) Petitioner and the others with him made a half-circle around Gonzaga, and then three of the young men surrounding Gonzaga, including Petitioner, pulled out guns. (*Id*. at 55.) At that point, Petitioner was standing to Gonzaga's left and a second individual, Jamie Jones ("Jones"), was standing in front of Gonzaga. (*Id*. at 56-57.) From about five feet away, Petitioner and Jones shot at Gonzaga, while a third individual, Basheem Smalls ("Smalls"), dropped his gun to the floor. (*Id*. at 56, 71.)[4] A bullet entered the side of Gonzaga's head and exited at the bridge of his nose, causing him to lose his eye. (*Id*. at 58.)

The only other person in the vicinity of the incident was Leslie (the victim of the earlier shooting), who was about 30 to 40 feet away when Gonzaga was shot. (*Id*. at 129.) Although he did not see Gonzaga get shot, nor did he see who shot Gonzaga, Leslie testified that he saw that Petitioner and Jones had guns. (*Id*. at 116, 128.) After Gonzaga was shot, Leslie helped Gonzaga back to his building and then called the police. (*Id*. at 117.) EMS paramedics arrived

---

[4] For his role in the Gonzaga shooting, Jones was separately charged with four counts of Assault in the First Degree, two counts of Attempted Murder in the Second Degree, one count of Assault in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. He was eventually convicted of two counts of Assault in the First Degree and one count of Criminal possession of a weapon and was acquitted of the remaining counts. (Snitow Decl., Ex. B at 3 n.2.)

and took Gonzaga to Saint Luke's Hospital. (*Id*. at 78.) Detective Patrick Porteus responded to the hospital at about the same time that Gonzaga and his mother (Gonzalez), arrived with EMS. (*Id*. at 159.) At the detective's request, Gonzalez asked Gonzaga who shot him, and Gonzaga repeated "Junior and Jamie." (*Id*. at 31, 161.) Gonzalez confirmed at trial that "Junior" referred to Petitioner. (*See id*. at 19.)

A few weeks before Petitioner's trial, Petitioner threatened Leslie on two occasions. (Snitow Decl., Ex. B at 11-12; *see also* Tr. at 119-20.) On the first of those occasions, Petitioner warned Leslie that, if he testified against Petitioner, Petitioner would "have [him] shot or harmed" (Tr. at 119); on the second occasion, Petitioner told Leslie he would "shoot him or cut him or something" (*id*. at 120).

## PROCEDURAL HISTORY

### A.    Pretrial Motion To Consolidate Indictments

Petitioner's first claim in this habeas proceeding relates to the trial court's consolidation of the indictments against him, relating to the two separate shooting incidents. The issue of consolidation first arose in pretrial proceedings held in Petitioner's case, when the prosecution moved to consolidate the indictments pursuant to Section 200.20 of the New York Criminal Procedure Law.

Initially the prosecution moved to consolidate the indictments under subsection (a) of C.P.L. § 200.20, which provides that "[t]wo offenses are 'joinable' when . . . [t]hey are based upon the same act or upon the same criminal transaction, as that term is defined in subdivision

two of section 40.10."[5]  In support of its argument that consolidation would be proper under this provision, the prosecution argued that the two shootings at issue arose "from [Petitioner's] ongoing scheme to injure and kill two men who [were] closely acquainted with each other and whose families [were] close friends."  (Snitow Decl., Ex. A (Brief for Defendant-Appellant, dated May 2004 at 4.)  More specifically, according to the prosecution, Petitioner's sister had reason to believe that Petitioner "was going to kill both victims and their families."  (*Id*.)[6]

In addition, the prosecution argued that consolidation was appropriate under subsections (b) and (c) of C.P.L. § 200.20, which provide that indictments may be joined when they "are of such nature that either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first," N.Y. C.P.L. § 200.20(b), or when the "offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law," *id*. § 200.20(c).  According to the prosecution, proof of one shooting in this instance would be admissible and material evidence of the other shooting; further, the prosecution noted that each indictment charged Petitioner with the same or similar statutory provisions (*i.e.*, attempted murder in the Second Degree and First Degree Assault).  (*See* Snitow Decl., Ex. B, at 18-19.)

_____

[5] Section 40.10(2), in turn, provides that:  "'Criminal  transaction' means conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture."  N.Y.C.P.L. § 40.10(2).

[6] Despite this argument, the prosecution was ultimately unable to prove at trial that there was a connection between the two shootings.  (*See generally* Tr.; *see also* Snitow Decl., Ex. A, at 19.)

Petitioner, through counsel, opposed the proposed consolidation as unfounded, and on the ground that the "prejudice to [Petitioner resulting from a combined trial] would outweigh the benefits of judicial economy because it would be 'difficult, if not impossible, for a jury to truly keep both offenses separate in their collective mind.'" (*Id.*, Ex. B at 20.) On September 4, 2002, the trial court (Bonnie Wittner, J.S.C.), granted the People's consolidation motion. (*Id.*, Ex. A at 5.)

**B.      The Prosecutor's Summation at Trial**

In his second habeas claim, Petitioner alleges that the prosecutor engaged in misconduct during summation that rendered the trial fundamentally unfair.

For his part, Petitioner's counsel devoted much of his summation to attacking the credibility of the prosecution's witnesses, pointing out, in particular, that the two shooting victims, Leslie and Gonzaga, themselves had criminal records. In fact, defense counsel began his summation by stating:

> The prosecutor has failed to prove to you beyond a reasonable doubt that [Petitioner] shot at two people because those two people who testified here are not believable witnesses.
>
> They were not only unconvincing, they are unworthy of your belief. They cannot be trusted quite simply.
>
> They come into court and ask for the laws to help them when it suits them, otherwise in their daily life, in their past life, they have no respect for the law.
>
> They are both criminals. one is currently a drug dealing criminal, and the other . . . used to be.

(Tr. at 216.) After noting Leslie's criminal history and arguing that all Leslie was trying to do was "sell [the jury] a story," Petitioner's counsel asked the jury to conclude that, "[i]n a word,

Mr. Leslie is a liar, . . . a cool and confident liar." (*Id*. at 218.) Counsel similarly challenged the credibility of the other witnesses who testified for the prosecution (*see id.* at 220-26), and also criticized the prosecutor for putting Gonzaga's mother on the stand, contending that this was done merely in an effort to obtain the sympathy of the jury (*id*. at 226).

In response to Petitioner's counsel's attack on the credibility of the prosecution witnesses, the prosecutor began his summation by stating:

> Bad people are still protected by the law, no matter how bad they may be.
>
> That is why you are not allowed to go around shooting bad people. And bad people are capable of telling the truth no matter how bad they may be, that is why a jury is free to convict someone based on the testimony of bad people.

(*Id*. at 228.)

The prosecutor then went on to argue that defense counsel's main objective in telling the jury to focus on the fact that Leslie and Gonzaga were themselves "bad people" was to divert the jury's attention from the facts of the case. (*See id.* at 231.) The prosecutor suggested that defense counsel did not want the jury to look at the evidence in the record, including witness testimony, photographs of injuries, medical records, maps, and the 911 call record; that, in particular, there was no evidence in the trial record to discredit the 911 call;[7] and that defense counsel was playing "the distraction game." (*See id.* at 229-31.) As to the fact that no weapon was ever recovered, the prosecutor speculated that the reason for this was that Petitioner "took

_____

[7] Initially, the prosecutor noted that defense counsel "ha[d] nothing to disprove the 911 calls," but, when the trial court sustained an objection to this remark on the ground that it improperly shifted the burden of proof to the defense, the prosecutor rephrased his comment to "you have heard no evidence discrediting the 911 call." (*Id*. at 230-31.)

his gun with him," a comment as to which the court sustained an objection by defense counsel. (*Id.* at 246.)

The prosecutor also told the jury, *inter alia,* that he "bet [the jury] could tell" that Gonzalez was telling the truth (*id.* at 233), and that Murray "ha[d] no reason to lie" (*id.* at 240). He further argued that Petitioner's threats to harm Leslie if he testified against Petitioner were "absolute proof" of Petitioner's guilt.  (*Id.* at 241.)  The prosecutor also argued to the jury that the civilian witnesses had "hated" being at the trial (*id.* at 252); that Gonzaga had to be "face[] to face with the man who tried to blow his brains out" (*id.*); that the jury could see Gonzaga's fear (*id.* at 254); that Gonzaga "relive[d] the image" of Petitioner pointing a gun at his head "each time he [woke] up" (*id.* at 258-59); and that Gonzaga had been the victim of a "close range firing squad" (*id.* at 262).[8]  Finally, in closing, the prosecutor particularly reminded the jury of Gonzalez's testimony, suggested that the jury had itself seen "how difficult it was for her" to testify (*id.* at 264), argued that she had testified "to see to it that justice [was] done"[9] and to hold Petitioner accountable (*id.* at 265), and told the jury:  "She did her part, now it is your turn to do your part" (*id.*).

Defense counsel made a number of objections to remarks made by the prosecutor during summation, and moved for a mistrial afterwards.  In seeking a mistrial, counsel argued that the cumulative effect of improper and inflammatory comments by the prosecutor rendered Petitioner's trial unfair.  (*See id.* at 311-13.)  The trial court, however, rejected Petitioner's

---

[8] The court sustained Petitioner's counsel's objections to some of these remarks.  (*See infra* at 29.)

[9] The court also sustained an objection to this comment and ordered it stricken from the record.  (*Id.*)

motion for a mistrial, finding that "the summation was not so prejudicial as to deprive defendant of a fair trial." (*Id.* at 313.)

### C. Verdict and Sentencing

On November 4, 2002, the jury convicted Petitioner of two counts of attempted murder in the second degree, one count of assault in the first degree, and one count of attempted assault in the first degree. (*Id.* at 317-20.) On December 9, 2002, Petitioner was sentenced as a second felony offender to consecutive terms of 10 and 12 years imprisonment. (Transcript of sentencing proceedings, dated Dec. 9, 2002 ("Sentencing Tr."), at 9.)

### D. Direct Appeal

In May 2004, Petitioner appealed his conviction to the Appellate Division, First Department, claiming that his right to a fair trial was violated by: (1) the trial court's consolidation of the indictments, which, Petitioner argued, allowed the jury to be "privy to bad act evidence which it would not have been permitted to hear if the offenses were not joined into a single trial, creating the strong possibility of undue prejudice" (Snitow Decl., Ex., A, at 20), and (2) the prosecutor's "egregious misconduct" during summation, which, according to Petitioner, included "using inflammatory language, eliciting sympathy for one of the shooting victims and his mother, burden shifting, denigrating the defense, vouching for his own witnesses, and speculating about an issue not addressed by the evidence" (*id.* at 25).

In a Decision and Order dated December 16, 2004, the Appellate Division unanimously affirmed Petitioner's convictions. (*Id.*, Ex. C.) With respect to Petitioner's claim challenging the consolidation of the indictments against him, the Appellate Division held that "the [trial] court appropriately exercised its discretion in granting the People's motion to consolidate the two indictments," as "[t]here was no material variance in the quantity of proof presented with

respect to the two crimes, and proof of each crime was presented separately and was easily segregable in the minds of jurors." (*Id.*, Ex. C (citations omitted).) With respect to Petitioner's claim challenging the prosecutor's conduct in summation, the court held that, "[a]lthough the prosecutor made several inappropriate comments, the court's curative actions were sufficient to prevent any undue prejudice," and that "[t]he remainder of the challenged remarks constituted fair comment on the evidence, and reasonable inferences to be drawn therefrom, in response to defense arguments." (*Id.* (citations omitted).)

On December 23, 2004, Petitioner sought leave to appeal to the New York Court of Appeals, enclosing a copy of his brief to the Appellate Division. (*Id.*, Ex. D.) On March 11, 2005, the Court of Appeals denied Petitioner's application on the ground that it presented "no question of law . . . which ought to be reviewed by the Court of Appeals." (*Id.*, Ex. F.)

### E.     Habeas Petition

Proceeding *pro se,* Petitioner timely filed his federal habeas petition on April 13, 2006.[10] The Petition raises the same two claims that Petitioner raised on direct appeal, *i.e.,* that his due process right to a fair trial was denied by (1) the improper consolidation of the indictments against him, and (2) prosecutorial misconduct. (*See* Pet. at ¶ 13.)[11]

---

[10] Although the Court's docket reflects a filing date of May 3, 2006 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the petition to have been filed on April 13, 2006, the date when Petitioner declared under penalty of perjury that he delivered the Petitioner to prison authorities to be mailed to the Court. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000). The petition is timely, as it was filed within one year of the date (June 9, 2005) when Petitioner's conviction became final for purposes of habeas review, *i.e.,* 90 days after the Court of Appeals denied Petitioner's application for leave to appeal. 28 U.S.C. § 2244(d)(1)(A) (2000).

[11] In the section of the Petition that calls upon Petitioner to state the grounds on which he is seeking habeas relief, Petitioner simply refers to his state court appellate brief, and attaches its

On October 20, 2006, Respondent opposed the Petition by filing the Snitow Declaration and exhibits thereto, together with a transcript of the state court proceedings and a memorandum of law. (*See* Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus, dated Oct. 19, 2006 ("Resp. Mem.") (Dkt. 6).)

**DISCUSSION**

## I.  <u>EXHAUSTION</u>

A federal court may not consider a petition for a writ of habeas corpus unless petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Doresy v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petition must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275 (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief. *See Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001).

Once the state courts are appraised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted). A petitioner will be found to have satisfied this requirement where, with his letter seeking leave to appeal, he submits a copy of his brief to the lower appellate court, and the "fair

---

Table of Contents. (*See* Pet., at ¶ 13, and attachment thereto.) Accordingly, where this Court refers herein to the specifics of Petitioner's various arguments, it will cite to Petitioner's brief to the Appellate Division, attached to the Snitow Declaration as Exhibit A.

import" of the total application suggests a request for review of the constitutional claims raised in that brief. *Galdamez v. Keane*, 294 F.3d 68 (2d. Cir. 2005).

Here, Petitioner expressly relied on the 14th Amendment in arguing to the Appellate Division that his right to a fair trial was violated by the allegedly improper consolidation of the indictments and by prosecutorial misconduct. (*See* Snitow Decl., Ex. A at 17, 25.) Petitioner then submitted his appellate brief to the New York Court of Appeals with his letter applying for leave to appeal (Snitow Decl, Ex. D), and the fair import of that submission suggested that he was seeking to have the Court of Appeals review the same constitutional claims that he raised before the Appellate Division (*see id.*). Accordingly, Petitioner's claims are exhausted and properly before this Court.

## II.    <u>STANDARD OF REVIEW</u>

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d). In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result.[12] *Williams*, 529 U.S. at 405-06. An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous" – rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).

---

[12] The Supreme Court has emphasized that "clearly established Federal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions."). Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief. *Id.* (citing *Musladin*).

## III.    PETITIONER'S CLAIMS

### A.    Consolidation of Indictments

Petitioner first claims that the trial court's consolidation of the separate indictments against him deprived him of a fair trial because the consolidation allowed the jury to hear evidence about two unrelated shootings.  (Snitow Decl., Ex. A.)  Petitioner raised this claim before the Appellate Division, which, as noted above, found that the trial court had properly granted the prosecution's consolidation motion.  (*See supra* at 10-11; Snitow Decl., Ex. C.)  As the state court adjudicated the claim on the merits, the claim is subject to review in this Court under the deferential standard set out in AEDPA.  *See* 28 U.S.C. § 2254(d).

In support of his claim, Petitioner points to the fact that, while the prosecutor's original stated basis for seeking consolidation was that the two shootings were part of an ongoing scheme to kill members of both victims' families, the prosecution never established such a scheme at trial.  (*See id.*, Ex. A at 17.)  Petitioner further argues that, although indictments may be properly joined under N.Y.C.P.L § 200.20(c) where (as here) the offenses "are defined by the same or similar statutory provisions and consequently are the same or similar in law,"[13] such joinder is discretionary and results in a denial of due process when it prejudices a defendant.  (*Id.*, Ex. A.)  Petitioner asserts that, in his case, the consolidation of indictments served to deprive him of due process of law, especially because the prosecutor commingled evidence of the two shootings during his summation, unduly confusing the jury, even in light of the trial judge's instruction that the evidence needed to be considered separately.  (Snitow Decl., Ex. A at 23.)  Respondent

---

[13] This provision of state law is applicable here because Petitioner was charged with attempted murder and either assault or attempted assault in connection with each of the two shootings.  (*See* Snitow Decl. at ¶ 6.)

counters that Petitioner has not met his difficult burden of showing that he was actually prejudiced by the consolidation and that he thus suffered a due process violation. (Resp. Mem., at 14-18.)

As a preliminary matter, it should be stressed that the issue for this Court is not whether the consolidation of the indictments in this case was proper under state law. Federal habeas relief "does not lie for errors of state law," *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and thus the only issue for this Court is whether the trial court's action in holding a single trial in this case so undermined the fairness of the trial that it failed to comport with constitutional due process standards. "Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it [a court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982).

In general, the Supreme Court has recognized that joint trials – "whether of several codefendants," or, as here, "of one defendant charged with multiple offenses" – are permissible, despite the fact that they may "furnish inherent opportunities for unfairness when evidence submitted as to one crime . . . may influence the jury as to a totally different charge." *Spencer v. Texas*, 385 U.S. 554, 562 (1967). The Court has reasoned that "[t]his type of prejudicial effect . . . is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of [the joint trial] . . . is a valid government interest." *Id.; see also, e.g., United States v. Lane*, 474 U.S. 438, 449 (1986) (holding that, in the absence of actual prejudice, joint trials are permissible in order to accommodate the interests of "'conserv[ing] state funds, diminish[ing] inconvenience to

16

witnesses and public authorities, and avoid[ing] delays in bringing those accused of crime to trial'" (citing *Bruton v. United States*, 391 U.S. 123, 134 (1968)).

Even "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane,* 474 U.S. 438, 446 n.8 (1986); *accord Herring v. Meachum,* 11 F.3d 374, 377 (2d Cir. 1993). "Therefore, where a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial." *Herring,* 11 F.3d at 377-78 (emphasis in original; citations omitted); *see also, e.g., Alejandro v. Scully*, 529 F. Supp 650, 651 (S.D.N.Y. 1982) ("[A] petitioner can mount a successful habeas corpus attack against a state trial court's decision on a request for a severance or consolidation only if the petitioner can show that the simultaneous trial of more than one offense was so prejudicial as to actually render the petitioner's state trial fundamentally unfair.").

In this case, Petitioner has not met his "onerous burden" of demonstrating that he suffered actual prejudice as a result of the consolidation of the indictments against him. *Herring,* 11 F.3d at 378. Regardless of whether the prosecutor, in summation, drew clear distinctions between the two shootings, the trial court plainly instructed the jury that it was required to consider the evidence separately as to each alleged crime:

> First you must evaluate separately the evidence that applies to each date and determine whether or not based on the evidence that applies to December 10th the People proved those crimes beyond a reasonable doubt. And again you must evaluate each of the evidence separately as it applies to the incident on December 12th, 2001.

17

(Tr. at 306.) The jury must be presumed to have followed these instructions, "unless there is an overwhelming probability that the jury [was] unable to follow the court's instructions, and a strong likelihood that the effect of the evidence [was] devastating" to Petitioner. *Herring,* 11 F.3d at 378 (quoting *Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (internal quotation marks omitted)).

Petitioner has offered no reason to believe that the jury was unable to follow the trial court's instructions in his case, especially given that the two crimes at issue involved different circumstances and different victims, who separately recounted for the jury what had happened to them on the two dates in question. *See Herring,* 11 F.3d at 378 (noting that, "because the evidence with respect to each [crime] was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited"); *see also Harris v. Burge,* No. 04 Civ. 5066 (HB)(FM), 2008 U.S. Dist. LEXIS 22981, at *23-24 (S.D.N.Y., Mar. 25, 2008) (Report and Recommendation) (petitioner's due process rights were not violated when he was tried in one trial for four separate robberies that occurred on four different days in four different locations because the trial court instructed the jury to consider the counts separately and to use the evidence "'only as it pertains to a particular count'" and also because "the four robberies were readily distinguishable"), *adopted by* 2007 U.S. Dist. LEXIS 85328 (S.D.N.Y. Oct. 29, 2007); *Rolling v. Fischer*, 433 F. Supp. 2d 336, 344 (S.D.N.Y. 2006) (petitioner, who was tried and convicted for robbing "nine different Manhattan nail salons on ten separate occasions" over a two-month period, was not deprived of due process by the consolidation of the indictments because the jury was instructed to consider each count separately and to "'make separate evaluations of the evidence'" and because any claim that the jurors could not keep the evidence separate was merely speculative).

Moreover, Petitioner has not suggested that his three-day trial was "unduly lengthy or complex," *Herring*, 11 F.3d at 378, or that anything about the jury's verdict was inconsistent or evinced a lack of understanding of the court's charge. Nor has Petitioner shown that the evidence of his involvement in one of the shootings was so much stronger than the evidence of his involvement in the other shooting that joinder created an extraordinary likelihood of actual prejudice. Finally, Petitioner has not shown – and would be hard-pressed to show, given the existence of eye-witness testimony identifying Petitioner as having shot at both Leslie and Gonzaga – that, but for the joint trial, he would have been acquitted of the charges arising from either of the two incidents.

In sum, Petitioner has not shown that he suffered actual prejudice sufficient to constitute a denial of his right to a fair trial. *See Shand v. Miller*, 412 F. Supp. 2d 267, 273 (W.D.N.Y. 2006) (denying habeas relief where Petitioner failed to show actual prejudice); *Bridgewater v. Walker*, No. 99 Civ. 2420 (RMB)(KNF), 2003 U.S. Dist. LEXIS 629, at *22 (S.D.N.Y. Jan. 13, 2003) (Report and Recommendation) (denying habeas relief where Petitioner "[could not] make the required showing of actual prejudice"), *adopted by* 2003 U.S. Dist. LEXIS 12941 (S.D.N.Y. July 28, 2003).

Accordingly, Petitioner has not demonstrated that the Appellate Division's decision rejecting his challenge to the trial court's consolidation of the indictments was either contrary to, or any unreasonable application of federal law. I therefore recommend that this claim be dismissed as without merit, under 28 U.S.C. § 2254(d).

### B.     **Prosecutorial Misconduct**

In his second claim, which also alleges a due process violation, Petitioner asserts that the prosecutor made impermissible comments during summation that were "so egregious, and so pervasive, that [Petitioner's] right to a fair trial was violated." (Sitnow Decl, Ex. A at 25.) As with his first claim, the Appellate Division rejected this claim on its merits (*see* Snitow Decl., Ex. C), and thus the claim is subject to review by this Court under AEDPA, 28 U.S.C. § 2254(d).

In determining whether a prosecutor's conduct warrants overturning a verdict, "[t]he relevant question," once again, "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Not only must a prosecutor have exceeded the broad latitude he is afforded, but his comments must have affected the entire proceeding so as to deny the defendant a fair trial. *Darden*, 477 U.S. at 181. Thus, the question of whether the defendant was denied a fair trial must be viewed in context. *United States v. Young*, 470 U.S. 1, 11 (1985). The relevant context includes whether the prosecutor's comments were invited by defense counsel, *id*. at 12; whether the comments were in fact improper; and, if they were improper, whether any curative measures were taken to mitigate prejudice or the impropriety was rendered harmless by the likelihood of conviction, *see Greer v. Miller*, 483 U.S. 756 (1987); *see also United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995).

Here, Petitioner complains about a number of comments made by the prosecutor during summation, which Petitioner challenges on various grounds, including that certain of the comments (1) shifted the burden of proof to Petitioner, (2) improperly attacked the defense strategy at trial, (3) bolstered the credibility of prosecution witnesses, (4) speculated regarding

the lack of certain evidence, (5) improperly characterized the strength of the inference that could

be drawn from evidence that Petitioner had threatened witnesses, (6) employed inflammatory

rhetoric, and (7) improperly appealed to the sympathy of the jury. (*See* Snitow Decl., Ex. A, at

25-33.) When viewed in context, however, the prosecutor's comments – alone or in

combination – were not so egregious as to render the Appellate Division's decision contrary to,

or an unreasonable application of federal law. Indeed, most of the comments challenged by

Petitioner can fairly be said to have been "invited" by Petitioner's counsel, and the remainder

were either not improper or not unduly prejudicial, given the strength of the evidence and the

content of the trial court's instructions to the jury.

### 1. Shifting the Burden of Proof

Petitioner first complains that the prosecutor shifted the burden of proof by stating in

summation that Petitioner "ha[d] nothing to disprove the 911 calls." (*See* Snitow Decl., Ex. A,

at 26-27 (citing Tr. at 230).) The trial court, however, sustained an objection to this statement

(Tr. at 230), and, as noted above (*see* n.7, *supra*), the prosecutor immediately reworded his

remarks so as merely to point out that the jury had "heard no evidence discrediting the 911 call"

(Tr. at 230-31). Moreover, in its charge, the court instructed the jury that:

> In our system of law the defendant is presumed to be
> innocent. The presumption stays with the defendant throughout
> the trial. The presumption of innocence continues while you
> deliberate until such time, if ever, the presumption of innocence is
> overcome by the jury's finding of guilt has been established
> beyond a reasonable doubt as to each element of the crime
> charged. It is the prosecution's burden to proof [*sic*] each element
> of any crime charged beyond a reasonable doubt and the burden
> never shifts to the defendant.
>
> Even though the defendant offered testimony in his case he
> does not have the burden of proof. That burden is always on the

> prosecution to prove the defendant's guilty beyond a reasonable
> doubt.

(*Id*. at 269-70.)  While it is improper for a prosecutor to make remarks suggesting that a

defendant has the burden of proving his innocence, *United States v. Miller,* 79 F.3d 338, 344

(2d Cir. 1996), the one remark complained of here, viewed in conjunction with the court's

immediate ruling, the prosecutor's rephrasing of the comment, and the court's full jury

instructions, was not sufficiently serious to undermine the fundamental fairness of Petitioner's

trial.

### 2. <u>Attacking the Defense Strategy</u>

Petitioner also contends that the prosecutor improperly attacked the defense strategy by

asserting that Petitioner's counsel – in challenging the integrity of the victims of the crimes and

the credibility of other prosecution witnesses – was trying to "distract" the jury from the

evidence of Petitioner's guilt.  (*See* Snitow Decl., Ex. A, at 27 (citing Tr. at 231, 234, 237).)  On

this point, even a cursory review of the transcript reveals that the prosecutor's comments were

invited by the comments of Petitioner's own counsel.  In particular, Petitioner's counsel had

suggested, in his own summation, that neither Leslie nor Gonzaga was believable because each

had a criminal record.  (*See* Tr. at 216-17 ("They are both criminals.  . . .  The witness

Michael Leslie who claims he was shot in the neck . . . by [Petitioner] . . . cannot even remember

the number of times he's been arrested, three or four times was his testimony, and he's only 16

years old.  He's in jail right now accused yet again of selling drugs . . . .").)  Further, Petitioner's

counsel repeatedly called Leslie a liar and commented that Gonzaga did not actually know who

shot him, even though he testified to the contrary.  (*Id*. at 218, 224.)  Petitioner's counsel also

suggested that the mothers of both Leslie and Gonzaga either lied at trial about what they saw or did not really see what they testified to seeing. (*Id*. at 220-22.)

It was in response to Petitioner's counsel's focus on Leslie's and Gonzaga's criminal records that the prosecutor began his summation by stating that "bad people are capable of telling the truth no matter how bad they may be, that is why a jury is free to convict someone based on the testimony of bad people." (*Id*. at 228.) It was also in this context that the prosecutor suggested to the jury that Petitioner's counsel was trying to "distract [the jury] from the facts of what happened on December 10th and December 12th." (Tr. at 231.) While it can be improper for the prosecution to attack the strategy of defense counsel, the prosecutor's comments here were permissible in the circumstances presented. *See, e.g., Rosario v. Walsh*, No. 05 Civ. 2684 (PKC) (AJP), 2006 U.S. Dist. LEXIS 33385, at *88 (S.D.N.Y. May 25, 2006) (Report and Recommendation) ("When faced with an attack on prosecution witnesses, a prosecutor may properly respond to that attack and call it a diversionary tactic during summation." (citing cases)), *adopted by* 2006 U.S. Dist. LEXIS 45726 (S.D.N.Y. July 5, 2006); *Montero v. Sabourin*, No. 02 Civ. 8666 (RWS), 2003 U.S. Dist. LEXIS 7290, at *23 (S.D.N.Y. May 1, 2003) ("A statement that defense counsel's attack[] on [a witness] was an attempt to divert attention away from the central testimony has been held to be a proper response to defense counsel's challenges to the [witness's] credibility." (citation omitted)).

Moreover, the prosecutor's comments must again be viewed in conjunction with the trial court's rulings and instructions. *Young,* 470 U.S. at 11; *Greer,* 483 U.S. at 766. Here, the trial court sustained an objection to the prosecutor's comment that Petitioner's counsel was "playing" a "distraction game" (Tr. at 231), and, when the prosecutor described Petitioner's counsel's summation as "very clever," the trial court, at that juncture, explained to the jury that the

"strategy or style of a lawyer is not really evidence, so it is not relevant" (*id.* at 234). These actions by the court served to minimize any prejudicial impact of the prosecutor's comments. In context, the challenged comments did not violate Petitioner's due process rights.

### 3. Bolstering the Credibility of Witnesses

Petitioner also contends that the prosecutor improperly bolstered the credibility of two prosecution witnesses, Gonzalez and Murray, by commenting in summation that he "would bet [that the jury] could tell [Gonzalez] was telling the truth" (Tr. at 233), and that Murray "ha[d] no reason to lie" (*id.* at 240).

Again, such comments can fairly be viewed as having been invited by Petitioner's counsel's vigorous attack on the credibility of the prosecution's principal witnesses. For example, in his own summation, Petitioner's counsel argued that Gonzalez's testimony was not believable. (*See id.* at 222.) The prosecutor, in turn, asked the jury "to think back to her demeanor and her words" (*id.* at 233), suggesting that the jury could tell from observing her on the stand and listening to her testimony that she was being truthful (*see id.; see also id.* at 240 ("you can see her demeanor, you determine if she was being truthful")). Under the circumstances, it appears that the prosecutor's remarks regarding Gonzalez's apparent truthfulness were a reasonable response to the statements made in summation by the defense. *See Young,* 470 U.S. at 56, 12 (prosecutor's injection into the trial of his own opinion as to the defendant's guilt, while improper, did not violate due process where the comment was invited by the remarks of defense counsel).

Moreover, viewed in context, it is difficult to see how the challenged statement by the prosecutor ("I would bet you could tell [Gonzalez] was telling the truth") could have constituted improper "bolstering" of Gonzalez's testimony, or "vouching" for her credibility. While "'[i]t is

24

unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence,'" *Young*, 470 U.S. at 8 (quoting ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980)), "not all uses of the pronoun 'I' are improper," *United States v. Elyayib*, 88 F.3d 157, 173 (2d Cir. 1996) (drawing a distinction between using "I" improperly to express a personal view or to endorse a belief and, properly, to rely on evidence or to ask the jury to draw inferences based on common sense). In this instance, it appears that the prosecutor was merely trying to suggest to the jury that, if it were to examine the witness's demeanor and testimony, it would conclude that she was being truthful. Thus, it appears that the trial court was correct in overruling Petitioner's objection to the prosecutor's remark on the ground that the prosecutor was not actually vouching for the witness's credibility. (*See* Tr. at 233.) Certainly, any misconduct by the prosecutor in this regard cannot be said to have been so severe as to violate Petitioner's constitutional right to a fair trial.

Similarly, although Petitioner's counsel had not specifically challenged Murray's testimony, it was not egregious misconduct (if it was misconduct at all) for the prosecutor to point out that Murray had no reason to lie and that his testimony was consistent with that of the various witnesses whom Petitioner's counsel had, in fact, accused of lying. (*See id.* at 240.) In any event, when Petitioner's counsel objected to the prosecutor's comment about Murray, the trial court specifically explained that the jury would "determine the credibility of all the witnesses." (*Id.*) As the jury is presumed to have followed the court's instructions, this curative instruction mitigated any risk of prejudice from the prosecutor's remark, assuming it was even improper. *See Greer*, 483 U.S. at 766 ("The sequence of events in this case – a single question, an immediate objection, and two curative instructions – clearly indicates that the prosecutor's improper question did not violate [the petitioner's] due process rights."); *Gonzalez v. Sullivan,*

934 F.2d 419, 424 (2d Cir. 1991) (holding that, although a prosecutor who personally vouched for a witness – stating, "There is no reason to lie. He did not lie. I will submit he did not lie." – had acted improperly, habeas relief was unwarranted because, "[g]iven the court's corrective actions and the strength of the evidence against the petitioner, the prosecutor's summation did not render the trial fundamentally unfair.").

4. **Speculating Regarding the Missing Gun**

Petitioner further argues that the prosecutor engaged in "pure speculation" when he told the jury, "You should focus on the fact [that] no weapon was recovered. Let me remind you [of] the reason we don't have a weapon, [Petitioner] took his gun with him." (Snitow Decl., Ex. A, at 28 (quoting Tr. at 246).) While the prosecutor's reference to the missing gun appeared to be a response to defense counsel's comment during summation that "[i]t would have been nice if all these police officers and all these detectives here exercised even the least amount of effort to collect some physical evidence, to execute search warrants on some of the residents to try and find a gun" (Tr. at 226), the trial court sustained Petitioner's objection to the prosecutor's statement (Tr. at 246). As described above, the court also later instructed the jury that, in its deliberations, it could not "indulge in speculation or guesswork" (*id.* at 266) or consider "anything outside of the evidence" (*id*. at 267). In addition, the court instructed the jury that,

> [w]ith respect to the closing arguments of counsel, if you find that
> any argument made by either lawyer was reasonable and logical
> and is based on the evidence in the record, you are free to accept
> that argument as your own and give it such weight as you deem
> advisable. On the other hand, if you find any argument or
> inference urged by the lawyers is not based on the evidence you
> heard or is unreasonable, illogical or inconsistent with the evidence
> you could disregard that particular argument entirely.

(Tr. at 268.)  Under these circumstances, the prosecutor's speculation as to what had happened to the gun did not fundamentally taint Petitioner's trial.  *See, e.g., King v. Mantello*, No. CV 98-7603 (SJ) (MDG), 2002 U.S. Dist. LEXIS 27646, at *44-45 (E.D.N.Y. Nov. 19, 2002) (any adverse effect of the prosecutor's speculative comments were remedied by the trial judge's sustaining of counsel's objection and instructions to the jury); *see also United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993) (noting that the government generally has "broad latitude in the inferences it may reasonably suggest to the jury during summations" and rejecting prosecutorial misconduct claim on finding that the defendant had suffered no substantial prejudice).

### 5.    Mischaracterizing the Strength of "Threat" Evidence

Petitioner also contends that the prosecutor improperly informed the jury that Petitioner's threats against Leslie were "absolute proof" of Petitioner's guilt.  (Snitow Decl., Ex. A, at 29 (citing Tr. at 241).  According to Petitioner, "[w]hile threat evidence may be admissible as 'consciousness of guilt' evidence, . . . the [New York] Court of Appeals has emphasized that such evidence is weak and cannot be used to suggest a 'strong inference' of guilt."  (*Id.* (citation omitted).)  At the time of the prosecutor's remark, however, Petitioner's counsel made no objection, and requested no curative instruction.

Moreover, even if the prosecutor's characterization of New York law was improper, it cannot be said to have violated Petitioner's federal due process rights, viewed in the totality of the trial, including the trial court's general instructions to the jury.  As noted above, the court instructed the jury that:  "[I]f you find [that] any argument or inference urged by the lawyers is not based on the evidence you heard or is unreasonable, illogical or inconsistent with the evidence[,] you could disregard that particular argument entirely."  (Tr. at 268.)  In light of this

instruction, which the jury is presumed to have followed, the jury was free to disregard the prosecutor's characterization of the evidence of Petitioner's threats against Leslie, and determine the appropriate weight to accord Leslie's testimony. Furthermore, in view of the other strong evidence of Petitioner's guilt presented at trial (*see infra* at 31), the Court cannot conclude that this comment caused Petitioner to suffer substantial prejudice. *See, e.g., United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004) (finding that, even if particular comments by the prosecutor were improper, they did not cause the defendant substantial prejudice where, *inter alia,* it was "highly likely [the defendant] would have been convicted even in the absence of the prosecutor's remarks").

### 6. Using Inflammatory Rhetoric

As for Petitioner's complaints regarding the prosecutor's so-called "inflammatory rhetoric" (Snitow Decl., Ex. A, at 30), the prosecutor's remarks appear to have been permissible, when viewed in context. By attacking Gonzaga's credibility and supposed lack of knowledge as to who shot him (*see* Tr. at 226 (suggesting that Gonzaga's "demeanor on the witness stand was rather lackadaisical, was not really responding to questions, was generally unhelpful"); *id*. at 224, 226 (arguing that "[Gonzaga] does not know who shot him" and that "when [Gonzaga] saw a gun, he already turned to run")), Petitioner's counsel invited the prosecutor's response that "Mr. Gonzaga told us on December 12th, 2001, the defendant, Henry McCall, a man he had known for years pulled out a gun, and pointed it at his head and fired. He has known him for years. [He d]id not express any doubt whatsoever that the defendant had a gun." (*Id*. at 252.) In the same way, Petitioner's counsel invited the prosecutor's statements: "[D]o not think that [Gonzaga] has only seen that imagery of [Petitioner] only one time" (*id*. at 259), and "Do you not think that image passes through his life over and over again . . . Let me suggest that the real

question is not does he really remember, the more appropriate question is will he ever forget." (*Id.*)

The prosecutor's further remarks, that Gonzaga was testifying against "the man who tried to blow his brains out" (*id*. at 252), that Gonzaga had faced a "firing squad" (*id.* at 262), and that he "relives" the shooting when he wakes up (*id*. at 259), may have been overly dramatic, and, indeed, the trial court sustained objections to each of those three remarks (*id.* at 252, 262, 259). Yet, even if improper, these statements, too, were plainly directed to the same responsive point – that, in the context of having been shot at close range, Gonzaga likely would have recalled the incident vividly, and, contrary to the suggestion of Petitioner's counsel, Gonzaga's testimony was thus reliable and worthy of belief.  Given the extent to which Petitioner's counsel challenged Gonzaga's reliability, it cannot be said that the prosecutor's "inflammatory" remarks so infected the trial as to create a due process violation.  *See, e.g., United States v. Elias*, 285 F.3d 183, 190-191 (2d. Cir. 2002) (holding that a mischaracterization of the defense counsel's argument by the prosecutor, meant to inflame the passions of the jury, was improper, but that any prejudice to the defendant was mitigated because, *inter alia,* it was a response to defense counsel's attack on the prosecution's witness).

### 7.     Appealing to Jury Sympathy

Petitioner also contends that the prosecutor improperly appealed to the jury's sympathies by stating that Gonzalez, the mother of one of the victims, had "[done] her part to see to it that justice [was] done" and that, at the close of trial, it was the jury's "turn to do [its] part."  (Snitow Decl., Ex. A, at 30 (citing Tr. at 264-65).)  The trial court, on an objection by Petitioner's counsel, struck the first of these comments, and counsel did not object to the second.  Further, the court then instructed the jury that its deliberations needed to be conducted "with a view of

reaching a fair and just verdict in accordance with the law, without regard to sympathy, prejudice or passion." (*Id.* at 265; *see also id.* at 308 (instructing the jury to be dispassionate in its deliberations).) Especially in light of the court's ruling and instructions, it cannot be said that these comments by the prosecutor gave rise to a due process violation. *See, e.g., Johnson v. Ercole,* No. 05-CV-3563 (DLI)(LB), 2007 U.S. Dist. LEXIS 17472, at *11 (E.D.N.Y. Mar. 13, 2007) (prosecutor's comments, which allegedly aroused sympathy for the victim, inflamed the emotions of the jury and demonized the petitioner, were "not so egregious as to infect the trial with unfairness"); *see also Darden*, 477 U.S. at 181 ("it is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." (quotation marks and citation omitted)).

### 8.  Cumulative Effect of the Prosecutor's Comments

Finally, Petitioner suggests that the cumulative effect of the prosecutor's alleged misconduct was sufficient to call into question the trial's fundamental fairness, even if isolated remarks, standing alone, were not so serious. (*See* Snitow Decl., Ex. A, at 32-33.) Viewing the trial as a whole, however, this Court cannot agree. Even combining every potentially improper statement made by the prosecutor, the potential prejudicial effect of such statements was limited by the court's instructions to the jury, and by the strength of the prosecution's case. *See Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) (upholding conviction where "the prosecutor's improper behavior, limited as it was to the summation, did not permeate the trial" and "[t]he cumulative effect of the challenged statements . . . was not so inflammatory or egregious as to require a finding of substantial prejudice"); *Player v. Artus*, No. 06 CV 2764 (JG), 2007 U.S. Dist. LEXIS 15792, at *29 (E.D.N.Y. Mar. 6, 2007) (while the "prosecutor's

comments were at times unnecessarily inflammatory, the challenged comments, whether considered individually or in the aggregate, were not severe enough to create a risk of substantial or injurious effect upon the verdict").  Given that the prosecution introduced eye-witness testimony identifying Petitioner as culpable in the shootings of both Leslie and Gonzaga, the fact that all of the testifying witnesses, including the victims of both shootings, knew Petitioner personally and thus were unlikely to have misidentified him as the shooter, and the overall lack of inconsistencies in the witnesses' testimony, it is likely that the jury would have convicted Petitioner of the charged crimes, regardless of the prosecutor's challenged remarks.  *See United States v. Elias*, 285 F.3d 183, 192 (2d Cir. 2002) (no prosecutorial misconduct where "[t]he specific remarks at issue did not touch upon or bolster the most potent of the government's evidence"); *Bradley*, 918 F.2d at 343 ("The clear evidence of guilt demonstrates that [petitioner] was not prejudiced by the prosecutor's improper remarks.").

For all of these reasons, the Appellate Division's rejection of Petitioner's prosecutorial misconduct claim was neither "contrary to" nor an "unreasonable application of" clearly established federal law.  *See* 28 U.S.C. § 2254(d); *Musladin*, 127 S. Ct. at 654.  Accordingly, I recommend that this claim be dismissed.

## CONCLUSION

For the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be DISMISSED in its entirety.  I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have 10 (ten) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Shira A. Scheindlin, United States Courthouse, 500 Pearl Street, Room 1620, New York, New York, 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Scheindlin. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298., 300 (2d Cir 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
     August 19, 2008

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

32

Copies to:

Hon. Shira A. Scheindlin, U.S.D.J.

Mr. Henry McCall
03-A-0018
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871-2000

Gary Steven Snitow, Esq.
District Attorney of New York County
One Hogan Place
New York, NY 10011